# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** *et al.* | |
| **Plaintiffs,** | |
| v. | **CIVIL ACTION NO. 17-1183** |
| **GILEAD SCIENCES, INC** *et al.*, | |
| **Defendants.** | |

## OPINION

**Rufe, J.**                                                                                    **September 11, 2025**

Plaintiff-Relator Toby Travis brought this *qui tam* action against Defendant Gilead Sciences, Inc., on behalf of the United States, alleging violations of the Anti-Kickback Statute ("AKS") and False Claims Act ("FCA"). The United States declined to intervene.[1] The Court now addresses Gilead's Motion for Summary Judgment, Travis's Request for Judicial Notice, and Gilead's Motion for Terminating Sanctions.[2]

For the reasons discussed below, the Court will grant Travis's request for judicial notice and Gilead's motion for summary judgment and dismiss as moot Gilead's motion for terminating sanctions.

## I.    BACKGROUND[3]

### A.  Factual Background

Gilead is a biopharmaceutical company headquartered in Foster City, California. Gilead owns the drugs Sovaldi and Harvoni, which are direct-acting antivirals ("DAAs") designed to

---

[1] *See* Notice of Election to Decline Intervention [Doc. No. 18].

[2] Def.'s Mot. Summ. J. [Doc. No. 240]; Pls.' Request Judicial Notice [Doc. No. 307]; Def.'s Mot. Terminating Sanctions [Doc. No. 203].

[3] Unless expressly stated, the facts are undisputed.

treat the hepatitis C virus ("HCV"). Sovaldi was approved by the FDA on December 6, 2013, and Harvoni was approved on October 10, 2014.

Travis is a former Gilead employee. He worked as a Hepatic Therapeutic Specialist—a sales representative for HCV drugs—between July 2013 and October 2014, promoting Sovaldi in southern Oregon and northern California.[4] Gilead terminated Travis for several acts of misconduct.[5]

By way of background, HCV is a blood-borne infection that can cause liver cancer and cirrhosis, which impairs liver function and can lead to liver failure.[6] Before the approval of DAAs, the standard of care for HCV treatment was a 48-week course of treatment involving the injection of interferons into the body.[7] This treatment had a cure rate of only 55%, and 10-15% of patients would case treatment due to severe side effects, which included fever, weight loss, depression, and autoimmune issues.[8]

DAAs were first approved by the FDA in 2011.[9] Initially, these were used alongside injection-based treatments. This regimen improved cure rates to approximately 70% and reduced the duration of treatment to 24-28 weeks.[10] However, the first DAAs also introduced new side effects, including gastrointestinal symptoms and risk of liver failure.[11]

---

[4] Travis Dep., Def.'s Mot. Summ. J., Ex. 1, at 263 [Doc. No. 240-4].

[5] Def.'s Mot. Summ. J., Ex. 93, at GSI00000620-21 [Doc. No. 240-95].

[6] Def.'s Mot. Summ. J., Ex. 5 [Doc. No. 240-8].

[7] Def.'s Mot. Summ. J., Ex. 8, at 2 [Doc. No. 240-11].

[8] *Id.*; Expert Report of Dr. Kristen Marks, MD, Def.'s Mot. Summ. J. Ex. 2 ¶ 21 [Doc. No. 240-5] [hereinafter Marks Rpt.].

[9] Marks Rpt. ¶ 24 [Doc. No. 240-5]; Def.'s Mot. Summ. J., Ex. 6, at 300 [Doc. No. 240-9].

[10] Marks Rpt. ¶ 24 [Doc. No. 240-5]; Def.'s Mot. Summ. J., Ex. 6, at 300 [Doc. No. 240-9]; Expert Report of Dr. Anupam B. Jena, MD PhD, Def.'s Mot. Summ. J., Ex. 3 ¶¶ 27-28a [Doc. No. 247-2] [hereinafter Jena Rpt.].

[11] Marks Rpt. ¶ 25 [Doc. No. 240-5].

In December 2013, the FDA approved Sovaldi to treat adults with certain types of HCV.[12] Sovaldi was used in combination with another oral medication and without injection, reducing the treatment duration to just 12 weeks.[13] Overall cure rates of HCV for Sovaldi increased to 90%.[14] When Harvoni was approved in 2014, it improved outlook for treatment even more. Harvoni could be used without any injections and was the first, once-daily, single-pill treatment for HCV.[15] It had a cure rate of 94-99% and treatment duration ranged from 8-12 weeks.[16] In clinical trials, less than 1% of patients discontinued Harvoni due to adverse side effects.[17]

*Speaker Programs*

The approval of Sovaldi and Harvoni meant that HCV treatment was more accessible to both patients and healthcare professionals ("HCPs").[18] Gilead organized speaker programs, which are a mainstay in the pharmaceutical industry, with the intention of educating HCPs about Sovaldi, Harvoni, and the HCV disease state.[19]

Gilead scheduled the first speaker program for Sovaldi shortly after it was approved in December 2013.[20] Gilead continued to schedule speaker programs to train HCPs on the benefits,

---

[12] *U.S. Food and Drug Administration Approves Gilead's Sovaldi™ (Sofosbuvir) for the Treatment of Chronic Hepatitis C*, **Gilead Scis. Inc.** (Dec. 6, 2013), https://www.gilead.com/news/news-details/2013/us-food-and-drug-administration-approves-gileads-sofosbuvir-for-the-treatment-of-chronic-hepatitis-c [https://perma.cc/Y94S-6V99].

[13] Marks Rpt. ¶¶ 27, 38 [Doc. No. 240-5]; Def.'s Mot. Summ. J., Ex. 6, at 299-304 [Doc. No. 240-9].

[14] Marks Rpt. ¶¶ 27, 38 [Doc. No. 240-5].

[15] Def.'s Mot. Summ. J., Ex. 11 [Doc. No. 240-13]; Marks Rpt. ¶ 39 [Doc. No. 240-5]; Def.'s Mot. Summ. J., Ex. 6 [Doc. No. 240-9].

[16] Marks Rpt. ¶ 39 [Doc. No. 240-5].

[17] *Id.*

[18] Crippin Dep., Def.'s Mot. Summ. J., Ex. 7, at 197 [Doc. No. 240-10]; Marks Rpt. ¶ 48 [Doc. No. 240-5].

[19] Def.'s Mot. Summ. J., Ex. 12 [Doc. No. 240-14].

[20] Def.'s Mot. Summ. J., Ex. 14, at ECF page 3 [Doc. No. 240-16].

risks, and appropriate uses of Sovaldi until November 2014, after the FDA approved Harvoni.[21] Gilead began hosting speaker programs for Harvoni October 2014.[22] The HCV treatment landscape changed rapidly throughout the 2010s.[23] From December 2013 to August 2019, Gilead also held "unbranded" speaker events intended to provide important education about the HCV disease state.[24]

Throughout the relevant time period, Gilead's Business Conduct Manual ("BCM") stated that "[s]peakers must not be nominated or selected based on explicit or implicit understanding, hope, or desire that they will prescribe, purchase, or recommend Gilead products as a result of participation in the Speaker Bureau."[25] The BCM also required that speakers entered into contracts that included a fee schedule and an hourly rate, which made clear that their payments did not take into account past or future prescriptions.[26] Gilead set its payment for speakers based on a third-party vendor's determination of fair market value based on their specialties and levels

---

[21] *Id.*; Jena Rpt. ¶ 47 [Doc. No. 247-2]; Def.'s Mot. Summ. J., Ex. 14, at ECF page 5 [Doc. No. 240-16].

[22] Def.'s Mot. Summ. J. Ex. 14, at ECF page 6 [Doc. No. 240-16].

[23] Marks Rpt. ¶ 47 [Doc. No. 240-5].

[24] Jena Rpt. ¶ 47 [Doc. No. 247-2]; Def.'s Mot. Summ. J., Ex. 14 [Doc. No. 240-16]; Def.'s Mot. Summ. J., Ex. 15 [Doc. No. 240-17].

[25] 2013 BCM, Def.'s Mot. Summ. J., Ex. 81, at GSI00000076 [Doc. No. 240-83]; 2014 BCM, Def.'s Mot. Summ J., Ex. 16, at GSI00165105 [Doc. No. 240-18]; 2015 BCM, Def.'s Mot. Summ. J., Ex. 82, at GSI00165419 [Doc. No. 240-84]; 2016 BCM, Def.'s Mot. Summ. J., Ex. 83, at GSI00165263 [Doc. No. 240-85]; 2017 BCM, Def.'s Mot. Summ. J., Ex. 84, at GSI00218977 [Doc. No. 240-86]; 2018 BCM, Def.'s Mot. Summ. J., Ex. 85, at GSI00219147 [Doc. No. 240-87]; 2019 BCM, Def.'s Mot. Summ. J., Ex. 86, at GSI00209652 [Doc. No. 240-88].

[26] 2013 BCM, Def.'s Mot. Summ. J., Ex. 81, at GSI00000076 [Doc. No. 240-83]; 2014 BCM, Def.'s Mot. Summ J., Ex. 16, at GSI00165105 [Doc. No. 240-18]; 2015 BCM, Def.'s Mot. Summ. J., Ex. 82, at GSI00165419 [Doc. No. 240-84]; 2016 BCM, Def.'s Mot. Summ. J., Ex. 83, at GSI00165264 [Doc. No. 240-85]; 2017 BCM, Def.'s Mot. Summ. J., Ex. 84, at GSI00218978 [Doc. No. 240-86]; 2018 BCM, Def.'s Mot. Summ. J., Ex. 85, at GSI00219148 [Doc. No. 240-87]; 2019 BCM, Def.'s Mot. Summ. J., Ex. 86, at GSI00209653 [Doc. No. 240-88]; Nguyen Dep., Def.'s Mot. Summ. J., Ex. 17, at 255-56 [Doc. No. 240-19]; Ankoma-Sey Dep., Def.'s Mot. Summ. J., Ex. 9, at 189-91 [Doc. No. 240-12].

of expertise, and the BCM capped annual speaker compensation at $100,000.[27] Speakers were

trained on the HCV disease state, Gilead's products, and industry guidelines.[28]

Gilead sales representatives were also required to receive compliance training.[29] Gilead

monitored speaker programs internally and with a third-party company.[30] This monitoring

included notes on the quality of the presentation, the number of attendees, the use of sign-in

sheets, the suitability of the venue, and adherence to spending limits.[31]

*PAN Foundation Donations*

The Patient Access Network ("PAN") Foundation is an independent charitable

organization "that provide[s] financial assistance to patients living with life-threatening, chronic,

and rare diseases for their out-of-pocket prescription and medication costs."[32] PAN is one of the

largest independent "patient assistance programs" in the United States.[33] It is funded by

contributions from pharmaceutical manufacturers, individuals, and other charitable

---

[27] Nguyen Dep., Def.'s Mot. Summ. J., Ex. 17, at 260-61, 267-68 [Doc. No. 247-3]; Def.'s Mot. Summ. J., Ex. 18, at GSI00589194 [Doc. No. 247-4]; 2013 BCM, Def.'s Mot. Summ. J., Ex. 81, at GSI00000075 [Doc. No. 240-83]; 2014 BCM, Def.'s Mot. Summ J., Ex. 16, at GSI00165104 [Doc. No. 240-18]; 2015 BCM, Def.'s Mot. Summ. J., Ex. 82, at GSI00165418 [Doc. No. 240-84]; 2016 BCM, Def.'s Mot. Summ. J., Ex. 83, at GSI00165262 [Doc. No. 240-85]; 2017 BCM, Def.'s Mot. Summ. J., Ex. 84, at GSI00218976 [Doc. No. 240-86]; 2018 BCM, Def.'s Mot. Summ. J., Ex. 85, at GSI00219146 [Doc. No. 240-87]; 2019 BCM, Def.'s Mot. Summ. J., Ex. 86, at GSI00209651 [Doc. No. 240-88].

[28] Nguyen Dep., Def.'s Mot. Summ. J., Ex. 17, at 256-57 [Doc. No. 240-19]; Crippin Dep., Def.'s Mot. Summ. J., Ex. 7, at 31 [Doc. No. 240-10]; Frazier Dep., Def.'s Mot. Summ. J., Ex. 22, at 38 [Doc. No. 240-24]; Def.'s Mot. Summ. J., Ex. 23, at GSI00637383 [Doc. No. 240-25].

[29] Nguyen Dep., Def.'s Mot. Summ. J., Ex. 17, at 52-60 [Doc. No. 240-19]; Def.'s Mot. Summ. J., Ex. 20 [Doc. No. 240-22]; Def.'s Mot. Summ. J., Ex. 19 [Doc. No. 240-21]; Def.'s Mot. Summ. J., Ex. 21 [Doc. No. 240-23].

[30] 2013 BCM, Def.'s Mot. Summ. J., Ex. 81, at GSI00000085 [Doc. No. 240-83]; 2014 BCM, Def.'s Mot. Summ J., Ex. 16, at GSI00165115 [Doc. No. 240-18]; 2015 BCM, Def.'s Mot. Summ. J., Ex. 82, at GSI00165427 [Doc. No. 240-84]; 2016 BCM, Def.'s Mot. Summ. J., Ex. 83, at GSI00165272 [Doc. No. 240-85]; 2017 BCM, Def.'s Mot. Summ. J., Ex. 84, at GSI00218986 [Doc. No. 240-86]; 2018 BCM, Def.'s Mot. Summ. J., Ex. 85, at GSI00219157 [Doc. No. 240-87]; 2019 BCM, Def.'s Mot. Summ. J., Ex. 86, at GSI00209662 [Doc. No. 240-88]; Def.'s Mot. Summ. J., Ex. 25 [Doc. No. 240-27].

[31] *E.g.*, Def.'s Mot. Summ. J., Ex. 26 [Doc. No. 240-28].

[32] Def.'s Mot. Summ. J., Ex. 31 [Doc. No. 240-33].

[33] *Id.*

foundations.[34] Since its founding in 2004, PAN has distributed over $4 billion to over 1 million patients.[35] To receive assistance from PAN, patients were required to have income within 400 to 500% of the federal poverty limit, and maximum assistance was capped at $4,500 to $10,000 per year.[36] Applicants also had to have insurance that covered the drug in question.[37]

PAN assists patients through a number of specific "disease funds," including a fund devoted to HCV.[38] PAN's HCV Fund's March 2018 formulary included more than 20 drugs, including Sovaldi and Harvoni.[39] During the period at issue, Gilead donated $637 million to the PAN Foundation's HCV Fund; during that time, PAN's HCV Fund provided just under $474 million in assistance for Sovaldi and Harvoni.[40]

*Support Path*

Before the launch of Sovaldi, Gilead created a program called "Support Path" to assist patients who had been prescribed one of Gilead's HCV medicines.[41] Gilead hired an independent company to manage the program.[42] That company operated a call center that helped patients confirm insurance coverage, understand insurance decisions for Sovaldi or Harvoni, and, in appropriate cases, refer eligible patients to patient assistance programs, including PAN.[43]

---

[34] *Id.*

[35] Def.'s Mot. Summ. J., Ex. 32, at 5 [Doc. No. 230-34].

[36] Def.'s Mot. Summ. J., Ex. 35, at GSI00090648, at slide 8 [Doc. No. 247-9].

[37] *Id.* at slide 3.

[38] Def.'s Mot. Summ. J., Ex. 33 [Doc. No. 240-35].

[39] Def.'s Mot. Summ. J., Ex. 68 [Doc. No. 240-70].

[40] Jena Rpt. ¶ 110 [Doc. No. 247-2].

[41] Sebastiani Dep., Def.'s Mot. Summ. J., Ex. 37, at 23, 26 [Doc. No. 240-39].

[42] *Id.* at 27-28.

[43] *Id.* at 31-33.

### B. Procedural History

Travis filed this case under seal on March 16, 2017, alleging that Gilead had violated the AKS in connection with its Sovaldi and Harvoni speaker programs and PAN donations, and thus, the resulting claims to Medicare and Medicaid violated the FCA. While the case remained sealed, Travis filed two amended complaints.[44] The United States and all named plaintiff states declined to intervene.[45] The case was unsealed and served in December 2021 and Travis filed a third amended complaint ("the Operative Complaint").[46]

The Operative Complaint alleges that Gilead conducted pre-approval marketing of Sovaldi and Harvoni, marketed off-label uses of Sovaldi and Harvoni, made misleading, inaccurate, and false marketing statements to prescribers, paid co-pays of patients prescribed Sovaldi and Harvoni by funneling money to patients through a third-party entity called the "PAN Foundation," and established sham "speaker programs" to direct meals, vacations, and cash payments to high volume prescribers.[47] Gilead moved to dismiss, and the Court granted Gilead's motion to dismiss except with respect to Relator's allegations regarding the Speaker Programs and the PAN Foundation.[48] The parties then conducted extensive discovery.

Following the close of discovery, Defendants filed two dispositive motions: one for sanctions, asking the Court to dismiss Travis's lawsuit on the basis that he has knowingly perpetrated "a fraud on [this] Court,"[49] and one for summary judgment, arguing that discovery

---

[44] *See* Pls.' First Am. Compl. [Doc. No. 4]; Pls.' Second Am. Compl. [Doc. No. 11].

[45] *See* Notice of Election to Decline Intervention [Doc No. 18].

[46] *See* Pls.' Third Am. Compl. [Doc. No. 49].

[47] *Id.*

[48] *See* Mem. Op., at 29-30 [Doc. No. 67].

[49] Def.'s Mem. Supp. Mot. Terminating Sanctions at 2 [Doc. No. 203-1].

has refuted the allegations the Court relied on in allowing Travis's claims to survive dismissal.[50] In support of his responses, Travis filed a request for judicial notice of a recent stipulation, settlement, and dismissal in a similar case.[51]

## II.    PLAINTIFF-RELATOR'S REQUEST FOR JUDICIAL NOTICE

The Court first addresses Travis's Request for Judicial Notice.[52] Travis requests the Court take judicial notice of the recent Stipulation and Order of Settlement and Dismissal ("Stipulation") entered in *United States ex rel. Bellman v. Gilead Sciences, Inc*. to support his opposition to both Gilead's Motions for Terminating Sanctions and Summary Judgment.[53]

The Stipulation includes admissions made by Gilead as part of the settlement of a "factually similar case" brought by the United States and a whistleblower for alleged violations of the FCA and AKS., relating to speaker programs Gilead conducted with respect to various HIV drugs between January 1, 2011, and November 17, 2017.[54] Gilead in that case admitted that the speaker programs were part of its marketing efforts to increase sales, that the speaker programs were used to target "must win" accounts, that it paid for speakers to travel to "desirable travel destinations," and that its "policies and procedures failed to prevent Sales Representatives and Regional Directors in its HIV therapeutic area from improperly providing honoraria payments, meals, and travel expenses to healthcare providers who spoke at or attended HIV Speaker Programs to induce them to prescribe the Gilead HIV Drugs," among other things.[55]

---

[50] Def.'s Mem. Law Supp. Summ. J. at 8 [Doc. No. 247].

[51] *See* Pls.' Request Judicial Notice [Doc. No. 307].

[52] *Id.*

[53] *See* Pls.' Request Judicial Notice, Ex. A [Doc. No. 307-1].

[54] Pls.' Request Judicial Notice at 1 [Doc. No. 307].

[55] *Id.* at 1-3.

Gilead opposes the motion, arguing that the admissions concern a different therapeutic area and a different sales group, and have no relevance to this case.[56]

A court may take judicial notice of facts that are not subject to reasonable dispute because they are either "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."[57] Accordingly, the court may take judicial notice of public records and court filings.[58] While "[a] court 'must' take judicial notice if a party requests it and supplies the court with the necessary information,"[59] it may decline a request for judicial notice when the material at issue is "irrelevant, unduly prejudicial, or otherwise excludable."[60] Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action."[61]

Gilead does not dispute the accuracy of the Stipulation, which was entered into a court record, and the Court will take judicial notice of the Stipulation for purposes of ruling on Gilead's motion.

---

[56] *See* Def.'s Mem. Opp'n Request Judicial Notice [Doc. No. 311]; Def.'s Sur-Reply Mem. Opp'n Request for Judicial Notice [Doc. No. 318].

[57] Fed. R. Evid. 201(b)(1), (2).

[58] *Anspach v. City of Phila., Dep't of Pub. Health*, 503 F.3d 256, 273 n.11 (3d Cir. 2007); *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Ground Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999); *Sturgeon v. PharMerica Corp.*, 438 F. Supp. 3d 246, 257 (E.D. Pa. 2020) (citation modified).

[59] *Sturgeon*, 438 F. Supp. 3d at 257 (quoting Fed. R. Evid. 201(c)(2)).

[60] *Doe v. N.J. Dep't of Corrs.*, No. 03-2112, 2007 WL 9725059, at *8 (D.N.J. June 22, 2007). *See also Albion Eng'g Co. v. Hartford Fire Ins. Co.*, 779 F. App'x 85, 90 n.29 (3d Cir. 2019); *Al-Hasani v. Sec'y U.S. Dep't of Homeland Sec.*, 81 F.4th 291, 301 (3d Cir. 2023) (declining to notice divorce record because it was irrelevant to decision).

[61] Fed. R. Evid. 401.

III.    GILEAD'S MOTION FOR SUMMARY JUDGMENT

### A.  Legal Standard

Upon motion of a party, summary judgment is appropriate if "materials in the record" show "that there is no dispute as to any material fact and the movant is entitled to judgment as a matter of law."[62] Summary judgment may be granted only if the moving party persuades the court that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party."[63] A fact is "material" if it could affect the outcome of the suit, given the applicable substantive law.[64] A dispute about a material fact is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party."[65]

In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.[66] Further, a court may not weigh the evidence or make credibility determinations.[67] Nevertheless, the party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record.[68] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[69] This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it

---

[62] Fed. R. Civ. P. 56(a), (c)(1)(A).

[63] *Miller v. Ind. Hosp.*, 843 F.2d 139, 143 (3d Cir. 1988).

[64] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[65] *Id.*

[66] *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

[67] *Boyle v. Cnty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998).

[68] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

[69] *Anderson*, 477 U.S. at 249-50 (citations omitted).

is unnecessary and would only cause delay and expense."[70] Therefore, if, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine dispute as to any material fact, summary judgment is appropriate.[71]

### B. The False Claims Act and Anti-Kickback Statute

The FCA imposes civil liability on anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval [or] knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."[72]

Because Congress has recognized that the government cannot singlehandedly police all fraud against it, the FCA also permits private persons—relators—to bring *qui tam* suits to recover damages on behalf of the federal government, with the relator receiving a percentage of any recovery or settlement.[73]

"During the 150-plus years since enactment of the FCA, it has become one of the federal government's most successful enforcement mechanisms against government contractors and in no industry has it been more impactful than in health care."[74]

The AKS imposes criminal liability on anyone who

knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to purchase . . . or arrange for or recommend purchasing . . . any good . . . for which payment may be made in whole or in part under a Federal health care program.[75]

---

[70] *Walden v. Saint Gobain Corp.*, 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citing *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976)).

[71] *Celotex*, 477 U.S. at 322; *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).

[72] 31 U.S.C. § 3729(a)(1)(A), (B).

[73] 31 U.S.C. § 3730(c).

[74] Deborah R. Farringer, *From Guns that do not Shoot to Foreign Staplers: Has the Supreme Court's Materiality Standard Under* Escobar *Provided Clarity for the Health Care Industry About Fraud Under the False Claims Act?*, 83 **Brook. L. Rev.** 1227, 1228 (2018).

[75] 42 U.S.C. § 1320a-7b(2).

"The AKS defines 'remuneration' as including 'transfers of items or services for free or for other than fair market value.'"[76] "Thus, the AKS forbids offering, paying, soliciting, or receiving kickbacks in exchange for recommending drugs covered by [federal health care programs]."[77]

In 2010, Congress amended the AKS through the Patient Protection and Affordable Care Act[78] to state that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]."[79] Accordingly, "[i]n the healthcare context, the AKS commonly serves as an FCA predicate."[80]

## C.  Discussion

Travis's remaining claims allege violations of the AKS based on Gilead's speaker programs and Gilead's donations to the PAN Foundation. To prove a violation of the AKS, Travis must show that Gilead: (1) paid "remuneration," (2) "one purpose" of which was to induce the remunerated parties to prescribe Sovaldi or Harvoni, and (3) that Gilead acted "knowingly and willfully" to induce the prescriptions.[81]

Gilead moved for summary judgment on the remaining claims based on both theories of liability. Gilead argues that Travis has not put forward any evidence that could satisfy the latter two elements of the AKS, and accordingly his FCA claims must fail. Further, in connection with the speaker programs, Gilead argues that Travis has not demonstrated that any false claims

---

[76] *U.S. ex rel. Fair Lab'y Practices Ass'n v. Quest Diagnostics, Inc.*, No. 05-5393, 2011 WL 1330542, at *2 (S.D.N.Y. Apr. 5, 2011) (quoting 42 U.S.C. § 1320a-7a(i)(6)).

[77] *U.S. ex rel. Kester v. Novartis Pharms. Corp.*, 23 F. Supp. 3d 242, 262 (S.D.N.Y. 2014).

[78] Pub. L. No. 1110148, 124 Stat. 119 (2010).

[79] 42 U.S.C. § 1320a-7b(g).

[80] *United States ex rel. Wheeler v. Union Treatment Ctrs., LLC*, No. SA-13-CA-4-XR, 2019 WL 571349, at *5 (W.D. Tex. Feb. 12, 2019).

[81] *United States ex rel. Gohil v. Sanofi U.S. Servs. Inc.*, No. 02-2964, 2020 WL 4260797, at *7 (E.D. Pa. July 24, 2020); *see* Mem. Op. at 20 [Doc. No. 67].

"resulted from" the alleged AKS violations.[82] Lastly, Gilead makes two legal arguments: 1) that the FCA's public-disclosure bar requires dismissal of claims—like those presented here—where "substantially the same allegations . . . were [already] publicly disclosed;"[83] and 2) that the FCA's *qui tam* provision violates the appointments clause and renders the FCA unconstitutional.

### 1.  Public Disclosure Bar

The public disclosure bar requires dismissal of an FCA claim, "unless opposed by the Government," where "substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed" in certain venues unless "the person bringing the action is an original source of the information."[84]

Pursuant to their respective state False Claims Acts, California, Connecticut, Delaware, Hawaii, Illinois, Massachusetts, Minnesota, Montana, Nevada, New York, North Carolina, Rhode Island, Tennessee, Virginia, and Washington filed a statement of interest opposing dismissal of this action on the basis of the public disclosure bar.[85] As the public disclosure bar is not jurisdictional under current law,[86] and multiple states on behalf of whom Travis brings claims have objected to its application, the Court declines to analyze whether the public disclosure bar applies here.[87]

---

[82] Def.'s Mem. Law. Supp. Mot. Summ. J. at 21 [Doc. No. 247].

[83] *Id.* at 27-30.

[84] 31 U.S.C. § 3730(e)(4)(A).

[85] *See* Filing States' Statement Interest Opp'n Dismissal Basis Public Disclosure Bar [Doc. No. 290]. Each Filing State's state public disclosure bar provides the same or similar "unless opposed by the Government" language as the Federal statute. *Id.* at 2-7. The Filing States otherwise take no position on the merits of Travis's claim. *Id.* at 8.

[86] *United States ex rel. Moore & Co., Pa. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 300 (3d Cir. 2016) ("We . . . join other circuits that have ruled that the amended version does not set forth a jurisdictional bar.").

[87] *See, e.g., United States ex rel. Conroy v. Select Med. Corp.*, 211 F. Supp. 3d 1132, 1152 (S.D. Ind. 2016) ("[T]he government's exercise of that right means the court's analysis under the public-disclosure bar ends here."); *United States ex rel. Turner v. Dynamic Med. Sys., LLC*, No. 17-1757, 2022 WL 20804350, at *7-10 (E.D. Cal. Jan, 24, 2022).

2.  Appointments Clause

Gilead argues, in one paragraph at the end of its brief in support of summary judgment, that the *qui tam* provision of the FCA is unconstitutional because it violates the appointments clause. Gilead cites only to a single case from the Middle District of Florida[88]—which is currently on appeal to the Eleventh Circuit—that held that FCA relators qualify as "Officers of the United States," and thus must be appointed by the President, a federal court, or a department head, because they "exercis[e] significant authority pursuant to the laws of the United States" and "occupy a 'continuing' position established by law."[89]

This argument lacks merit. The Supreme Court has long distinguished an officer from a relator, whose "position is without tenure, duration, continuing emolument, or continuous duties."[90] A relator does not exercise any authority: "[a]lthough a relator may sue in the government's name, the relator is not vested with governmental power . . . [and] the government may take complete control of the case if it wishes."[91] Nor does a relator occupy a continuing position established by law: "'at a minimum, a continuing and formalized relationship of employment with the United States Government" must exist for one to be an officer."[92] Since a relator is only a representative of the government and not an "officer," the FCA does not violate the Appointments Clause.

---

[88] *United States ex rel. Zafirov v. Fla. Med. Assocs.*, 751 F. Supp. 1293, 1323 (M.D. Fla. 2024).

[89] *Id.* at 1305-07; *Lucia v. SEC*, 585 U.S. 237, 245 (2018).

[90] *Auffmordt v. Hedden*, 137 U.S. 310, 327 (1890).

[91] *United States ex rel. Taxpayers Against Fraud v. General Elec. Co.*, 41 F.3d 1032, 1041 (6th Cir. 1994).

[92] *Friedman v. Rite Aid Corp.*, 152 F. Supp. 2d 766, 771 (E.D. Pa. 2001) (quoting *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749 (5th Cir. 2001) (*en banc*)).

Moreover, Courts in this District have uniformly rejected Article II challenges to the FCA's *qui tam* provision, as has every Court of Appeals to have addressed the issue.[93] Given the overwhelming weight of authority, this Court rejects Gilead's Appointments Clause argument.

Having rejected Gilead's legal arguments, the Court decides Gilead's summary judgment motion on the facts in the record.

### 3. Speaker Program Claims

Travis's first theory of liability is that Gilead violated the AKS by paying physicians, under the guise of a promotional speaker program, to induce them to write prescriptions of Sovaldi and Harvoni. The parties do not dispute that the first element of the AKS is satisfied: that honoraria for the speakers in the speaker program would constitute "remuneration." Gilead argues that Travis has not shown that the speaker programs were created for the improper purpose of inducing speakers to prescribe Sovaldi or Harvoni, that Gilead had the requisite scienter for the speaker programs, or that physicians recommended Sovaldi or Harvoni to their patients because of any speaker honoraria.

#### a. *Improper Purpose of Inducing Prescriptions*

Gilead first argues that Travis has presented no evidence from a which a reasonable jury could conclude that "one purpose" of Gilead's speaker honoraria "was to 'induce'" prescriptions of Sovaldi or Harvoni.[94] Travis offers three lines of evidence to show that the speaker programs were intended to induce speakers to prescribe Sovaldi and Harvoni: 1) Gilead selected and

---

[93] *See, e.g.*, *United States Dep't of Hous. & Urb. Dev. ex rel. Givler v. Smith*, 775 F. Supp. 172, 179-80 (E.D. Pa. 1991); *Friedman*, 152 F. Supp. 2d at 771; *United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 805 (10th Cir. 2002); *Riley*, 252 F.3d at 757-58; *Taxpayers Against Fraud*, 41 F.3d at 1041 ; *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 759 (9th Cir. 1993).

[94] Mem. Op. at 20 [Doc. No. 67].

retained speakers based on their prescription volume; 2) Gilead paid speakers above fair market rate; and 3) that the speaker programs were "shams."

*Selecting Speakers Based on Prescription Volume*

Travis first urges that he has adduced sufficient evidence that the speaker programs "were designed in part to funnel money to practitioners who prescribed high volumes of Sovaldi and Harvoni."[95]

FCA claims based on speaker programs such as this one have survived summary judgment when the relator offered direct evidence that the defendant monitored speakers' prescription habits.[96] Courts have also denied summary judgment when there was evidence that speakers had to meet specific prescription quotas to remain in the speaker program.[97] Here, despite years of discovery, Travis cannot point to evidence in the record—direct or circumstantial—that establishes that speaker programs focused on inducing and rewarding prescriptions by speakers.[98]

Witnesses that Travis deposed contradict his theory that the speaker program was intended to induce prescriptions.[99] Travis's expert Dr. Kanter explicitly confirmed that she made

---

[95] *Travis v. Gilead Scis., Inc.*, 596 F. Supp. 3d 522, 538 (E.D. Pa. 2022).

[96] *See, e.g.*, *United States ex rel. Arnstein v. Teva Pharms. USA, Inc.*, No. 13-3702, 2019 WL 1245656, at *13 (S.D.N.Y. Feb. 27, 2019).

[97] *Id.*; *c.f. United States ex rel. Bilotta v. Novartis Pharms. Corp.*, 50 F. Supp. 3d 497, 503 (S.D.N.Y. 2014) (same, on motion to dismiss).

[98] *United States ex rel. Wilkerson v. Allergan Ltd.*, No. 22-3013, 2024 WL 1242989, at *19 (N.D. Ill. 2024); *United States ex rel. Penelow v. Janssen Prods., LP*, No. 12-7758, 2021 WL 6052425, at *11 (D.N.J. 2021) (surviving summary judgment where seven employees testified that the speaker program was intended to induce and reward prescriptions)

[99] Adamoski Dep., Def.'s Mot. Summ. J., Ex. 38, at 247 [Doc. No. 240-40]; Bemiss Dep., Def.'s Mot. Summ. J., Ex. 39, at 122 [Doc. No. 240-41]; Blomgren Dep., Def.'s Mot. Summ. J., Ex. 40, at 72-73 [Doc. No. 240-42]; Christenson Dep., Def.'s Mot. Summ. J., Ex. 41, at 97-98, 208-09 [Doc. No. 240-43]; Farron Dep., Def.'s Mot. Summ. J., Ex. 42, at 45-46 [Doc. No. 240-44]; Johnson Dep., Def.'s Mot. Summ. J., Ex. 43, at 121 [Doc. No. 240-45]; Langston Dep., Def.'s Mot. Summ. J., Ex. 44, at 262-65 [Doc. No. 240-46]; Lam Dep., Def.'s Mot. Summ. J., Ex. 45, at 85-87, 268-70 [Doc. No. 240-47]; Mishra Dep., Def.'s Mot. Summ. J., Ex. 46, at 196-97 [Doc. No. 240-48]; Nguyen Dep., Def.'s Mot. Summ. J. Ex. 17, at 276-77 [Doc. No. 247-3].

no effort to determine "whether payments somehow rewarded people for prescribing in prior months" and "did no empirical analysis whatsoever of the type of [health care provides] that Gilead selected for speakers versus nonspeakers."[100]

Travis points to business plans that sales representatives and their supervisors prepared that included information about top prescribers and listed sets of "action[s]" that the sales representative would take to continue to interface with and develop a relationship with the prescriber.[101] Travis characterizes the plans as having "explicitly memorialized sales representatives' intent to have top prescribers speak more often (and/or add them to the speaker bureau) to increase their prescriptions[.]"[102] Coupled with evidence that sales representatives both had access to historical and real-time data on the prescriptions written by prescribers and had primary responsibility for scheduling, organizing, and executing Speaker Programs, including nominating speakers, Travis argues this is sufficient to meet his burden at summary judgment.

Travis overstates the import of the evidence on which he relies. The business plans included prescription data for all top prescribers, regardless of whether they were speakers, and had no prescription data for speakers who were not top prescribers. While the plans might note that a sales representative could engage with a prescriber via speaker programs (as a speaker or attendee), the plans do not lend themselves to a reasonable inference that any prescriber was chosen as a speaker because of their prescription volume or to induce prescriptions. This is a far

---

[100] Kanter Dep., Def.'s Mot. Summ. J., Ex. 70, at 208, 265-66 [Doc. No. 240-72].

[101] Blomgren Dep. Ex. 18, Pls.' Opp'n Mot. Summ. J., Ex. 443, at GSI 00108875 [Doc. No. 271-277].

[102] Pls.' Mem. Law. Opp'n Mot. Summ. J. at 6 [Doc. No. 269].

cry from the evidence in *United States ex rel. Arnstein v. Teva Pharmaceuticals USA, Inc.*, where "[s]ales representatives linked prescriber habits with their retention as speakers[.]"[103]

There is no evidence here that Gilead "considered the number of prescriptions a doctor had written in deciding whether to employ the doctor as a speaker" or "tracked the number of prescriptions written by speakers."[104] Accordingly, "no reasonable jury could find that [Gilead's] payments to physician-speakers violated the AKS."[105]

*Fair Market Value*

Travis next argues that he has adduced sufficient evidence for a reasonable juror to find that Gilead did not pay its speakers fair market value. Payment at fair market value "strongly indicates a lack of 'improper inducement.'"[106]

The record reflects that speaker contracts included a specified hourly rate, calculated by a third-party vendor based on different specialties and levels of expertise.[107] Travis does not question the fairness of those fair market value calculations.[108] Rather, he argues that Gilead paid its speakers "for much more time than they spent preparing to speak, or actually speaking,"[109]

---

[103] 2019 WL 1245656, at *13. The business plans in *Arnstein* included commentary that clearly demonstrated that physicians were asked to speak to increase their prescriptions: "Based on volume of scripts generated, we need to stay committed to working with Dr. [C] and Dr. [R]' on speaker programs." *Id.* at 13-14.

[104] *United States ex rel. Brown v. Celgene Corp.*, 226 F. Supp. 3d 1032, 1055 (C.D. Cal. 2016).

[105] *Id.*

[106] Mem. Law Supp. Mot. Summ. J. at 11 [Doc. No. 247] (quoting *United States ex rel. Perales v. St. Margaret's Hosp.*, 243 F. Supp. 2d 843, 851 (C.D. Ill. 2003)).

[107] 2013 BCM, Def.'s Mot. Summ. J., Ex. 81, at GSI00000076 [Doc. No. 240-83]; 2014 BCM, Def.'s Mot. Summ J., Ex. 16, at GSI00165105 [Doc. No. 240-18]; 2015 BCM, Def.'s Mot. Summ. J., Ex. 82, at GSI00165419 [Doc. No. 240-84]; 2016 BCM, Def.'s Mot. Summ. J., Ex. 83, at GSI00165264 [Doc. No. 240-85]; 2017 BCM, Def.'s Mot. Summ. J., Ex. 84, at GSI00218978 [Doc. No. 240-86]; 2018 BCM, Def.'s Mot. Summ. J., Ex. 85, at GSI00219148 [Doc. No. 240-87]; 2019 BCM, Def.'s Mot. Summ. J., Ex. 86, at GSI00209653 [Doc. No. 240-88]; Nguyen Dep., Def.'s Mot. Summ. J., Ex. 17, at 255, 267-68 [Doc. No. 247-3]; Ankoma-Sey Dep., Def.'s Mot. Summ. J., Ex. 9, at 189-91 [Doc. No. 240-12].

[108] Evans Dep., Def.'s Mot. Summ. J., Ex. 71, at 269 [Doc. No. 240-73].

[109] Pls.' Mem. Law. Opp'n Mot. Summ. J. at 9 [Doc. No. 269].

and contends that because the speaker events were a sham, any amount paid was above market value.[110]

As to Travis's argument that Gilead paid its speakers for more time than they spent preparing and speaking, Travis again overstates the evidence upon which he relies. The relevant witness, Amanda Christenson, indicated that speakers would generally present for an hour, not including time spent answering questions and conversing with attendees.[111] Gilead paid the fair market value contemplated this same two hours for each event, plus 1.5 hours dedicated to preparation, plus travel time.[112] Tellingly, Travis never shows how this calculation is unreasonable. The Court agrees with Gilead that "[i]f some speakers occasionally received compensation slightly above the exact number of hours they worked, that does not suggest Gilead's honoraria functioned as kickbacks." This squabble over the precise hours the speaker should have been paid for does not create a genuine dispute of material fact. In other words, if the speaker programs were legitimate, then the evidence establishes that Gilead paid a fair market value for the speakers' work, which indicates a lack of improper inducement. Accordingly, the Court must next address whether Travis has produced evidence to show that the speaker programs were not true educational programs.

*Sham Events*

The cornerstone of Travis's theory is that the speaker programs were sham events with no educational purpose. There are no clear criteria in the case law for what turns a speaker program from legitimate educational programming into a sham. Fundamentally, there must be evidence in

---

[110] Pls.' Surreply Mem. Law Opp'n Mot. Summ. J. at 9 [Doc. No. 299].

[111] Christenson Dep., Def.'s Reply Mem. Law Supp. Mot. Summ. J., Ex. 654, at 38 [Doc. No. 285-3].

[112] Def.'s Mot. Summ. J., Ex. 18, at GSI00589213-15 [Doc. No. 247-4]; Nguyen Dep., Pls.' Mem. Law Opp'n Def.'s Mot. Summ. J., Ex. 146, at 429-30 [Doc. No. 271-45].

the record that instead of serving any educational purpose, "the events constituted upscale, all-expense paid social outings for the doctors[.]"[113] At summary judgment, courts have found a genuine issue of material fact where the evidence demonstrated that programs were regularly given without legitimate attendees, that the programs were designed to have little to no educational value, and that the events were structured in a way that was not conducive to learning.[114]

Gilead argues that Travis and his experts "set out a grab-bag of arbitrary benchmarks" in an attempt to cast the speaker program as a sham, rather than meeting the hallmarks recognized by courts previously.[115] These "unprincipled, results-oriented" benchmarks, Gilead urges, are insufficient to survive summary judgment.

First, Travis asserts that attendance at programs was "systemically low." The evidence shows that no more than 1% of events had zero attendees, and no more than 4.8% had 1-3 attendees.[116] The fact that a few programs had low attendance is insufficient to support an inference that the programs were a sham.[117] Relatedly, Travis argues that the speaker programs were a sham if they included even one "inappropriate" attendee. Travis defines inappropriate broadly, including medical assistants, nurses, and anyone else who is unable to prescribe the

---

[113] *Bilotta*, 50 F. Supp. 3d. at 515.

[114] 2019 WL 1245656, at *15-20. *See also Bilotta*, 50 F. Supp. 3d at 515 (denying a motion to dismiss on these bases).

[115] Def.'s Mem. Law Supp. Mot. Summ. J. at 12 [Doc. No. 247].

[116] Jena Rpt. Ex. 11, at 64 [Doc. No. 247-2]; Def.'s Statement Undisputed Facts ¶ 69 [Doc. No. 247-1]; Def.'s Resp. Pls.' Counterstatement Material Facts ¶¶ 346, 348-50 [Doc. No. 288].

[117] In contrast, the evidence in *Arnstein* showed "thousands of examples of speaker programs with one or zero attendees." 2019 WL 1245656, at *16.

drug. No other case has gone so far,[118] and for good reason—why would the attendance of a medical assistant who cannot prescribe Sovaldi or Harvoni make the program any less meaningful for the doctors in attendance, not to mention the fact that the information may be useful for the medical assistant to have?[119] The Court does not accept this new criterion as evidence of a sham.

Second, Travis has not adduced sufficient evidence to create a dispute of material fact as to whether Gilead's speaker programs failed to provide relevant and genuine information about HCV, Sovaldi, and Harvoni. Travis concedes that the presentations were education, but nitpicks that they were repetitive, too rudimentary for some attendees, and too sophisticated for others.[120] This is insufficient to survive summary judgment. That a program is "not the . . . most fully educational speaker series that could be mounted" is "insufficient to establish the speaker series to be a sham."[121] Travis has not shown that the presentations were so basic as to be "barely appropriate for medical students," which could be evidence of a sham.[122]

Third, Travis contends that the elaborate venues and excessive costs of the speaker programs show that the programs were shams. Indeed, courts have found that lavish meals with

---

[118] *Compare Arnstein*, where the relator presented pages upon pages of programs where the *only* attendee was a sales representative, as "there were either no other attendees or all other attendees were illegitimate." 2019 WL 1245656, at *16.

[119] Indeed, both Gilead's Business Conduct Manual (BCM) and guidance promulgated by PhRMA contemplate the attendance of any "persons who are a party of the continuum of patient care." 2013 BCM, Def.'s Mot. Summ. J., Ex. 81, at GSI00000009-10 [Doc. No. 240-83]; 2014 BCM, Def.'s Mot. Summ J., Ex. 16, at GSI00165038-39 [Doc. No. 240-18]; 2015 BCM, Def.'s Mot. Summ. J., Ex. 82, at GSI00165360-61 [Doc. No. 240-84]; 2016 BCM, Def.'s Mot. Summ. J., Ex. 83, at GSI00165204-05 [Doc. No. 240-85]; 2017 BCM, Def.'s Mot. Summ. J., Ex. 84, at GSI00218919-20 [Doc. No. 240-86]; 2018 BCM, Def.'s Mot. Summ. J., Ex. 85, at GSI00219082-83 [Doc. No. 240-87]; 2019 BCM, Def.'s Mot. Summ. J., Ex. 86, at GSI00209583-84 [Doc. No. 240-88]; Def.'s Mot. Summ. J., Ex. 65, at 4 [Doc. No. 240-67].

[120] Pls.' Mem. Law. Opp'n Mot. Summ. J. at 15 [Doc. No. 269].

[121] *United States ex rel. Booker v. Pfizer, Inc.*, 188 F. Supp. 3d 122, 134 (D. Mass. 2016).

[122] *Arnstein*, 2019 WL 1245656, at *19.

excessive alcohol can indicate that a speaker program is a sham.[123] Here, Travis contends that Gilead held "many" programs at inappropriate venues: "entertainment venues, nightclubs, bars, resorts, and vacation destinations."[124] For example, Travis points to an event held at the Hakkasan Nightclub in Las Vegas.[125] But the evidence shows—even using Travis's criteria— that only 3.3% of the speaker programs were held at these "inappropriate" venues.[126] Once again, Travis is attempting to make something out of almost nothing.

Travis also argues that Gilead's official price cap of $125 per person per meal was too high and presents expert Laura Denton's testimony that a limit of $90 would have been more appropriate.[127] The evidence shows that Gilead hosted at least 4,716 programs that cost over $90 per person.[128] But Travis's need to contrive this new, lower price limit demonstrates that his argument lacks merit. Denton admits that she did not consider spending limits of other pharmaceutical companies and arrived at her $90 limit using various university policies.[129] Travis's expert Virginia Evans testified that "other pharmaceutical companies have used that $125 limit as being the limit for the amount of the meal."[130] Travis points to no evidence that Gilead's events "frequently exceeded" Gilead's official price cap of $125/person. Even if $90 could be seen as more appropriate, the evidence does not show that a $125 meal cap is so

---

[123] *Id.* at *20.

[124] Pls.' Mem. Law. Opp'n Mot. Summ. J. at 16 [Doc. No. 269].

[125] Pls.' Resp. Undisputed Facts & Counterstatement Material Facts ¶ 334 [Doc. No. 270]. While the Court could not identify the receipts and exhibits referenced in Plaintiff's counterstatement, the Court has accepted the counterstatement as true as is required by the summary judgment standard.

[126] Def.'s Mem. Law Supp. Mot. Summ. J. at 18 [Doc. No. 247]; Expert Report of Laura Denton, MS, Def.'s Mot. Summ. J., Ex. 79 ¶¶ 14-17, 48 [Doc. No. 240-81].

[127] Pls.' Mem. Law. Opp'n Mot. Summ. J. at 16 [Doc. No. 269].

[128] Pls.' Mem. Law. Opp'n Def.'s Mot. Summ. J., Ex. 130 [Doc. No. 271-29].

[129] Denton Dep., Def.'s Mot. Summ. J., Ex. 78, at 58 [Doc. No. 240-80]; Expert Report of Laura Denton, MS, Def.'s Mot. Summ. J., Ex. 79 ¶ 48 [Doc. No. 240-81].

[130] Evans Dep., Def.'s Mot. Summ. J., Ex. 71, at 120 [Doc. No. 240-73].

extravagant as to raise a triable inference that the meals were intended to induce prescriptions. At most, Travis has created a trivial dispute about the proper level of spending and the most appropriate locations for speaker events. He has created no genuine dispute of material fact.

Travis has not adduced sufficient evidence to demonstrate that the speaker programs were a sham, with one purpose to induce physicians to write prescriptions. At most, Travis's arguments might show that some of the events were "not the best, most cost-efficient, or most fully educational speaker series that count be mounted."[131] This is insufficient to show a violation of the AKS at summary judgment.

*Bellman Stipulation*

Finally, the Court addresses the Stipulation in *Bellman*, of which it took judicial notice above. Travis points to the Stipulation as evidence of a company-wide practice of using speaker programs as illegal kickbacks to induce prescriptions.[132] The question for the Court to determine now is, having determined that Travis has failed to adduce sufficient evidence that the HCV speaker programs were intended to induce prescriptions, whether this Stipulation wherein Gilead admits to such conduct in their HIV speaker program allows a reasonable juror to find in Travis's favor here.

The Court finds that, even considering the Stipulation together with the evidence produced in this case, Travis has still failed to produce sufficient evidence for a reasonable juror to find that the HCV speaker programs were intended to induce prescriptions. The Stipulation concerns a different sales team selecting different speakers for a program focused on different drugs and a different disease state. For that reason, where Travis has failed to adduce sufficient

---

[131] *Booker*, 188 F. Supp. 3d at 134.

[132] *See generally* Pls.' Request Judicial Notice [Doc. No. 307]; Pls.' Reply Mem. Law Supp. Request Judicial Notice [Doc. No. 312].

evidence about the HCV speaker program, the Stipulation that contains admissions regarding a different speaker program is not enough to create a genuine question of material fact.

> ### b. Scienter

Gilead next argues that Travis has not adduced sufficient evidence to show that Gilead violated the AKS "knowingly and willfully."[133] The Third Circuit has interpreted the scienter element to require that the defendant "knew his conduct was unlawful and intended to do something the law forbids."[134] Moreover, "under the FCA, 'collective knowledge' provides an inappropriate basis for proof of scienter."[135]

Couts have found a genuine dispute about scienter where the record includes evidence that the defendant made no real effort to detect or deter kickbacks. For example, in *Arnstein*, the defendant "had a singularly weak compliance department, with a very small staff . . . , overseen for many years by a former paralegal with no formal compliance training," and was unable to "track such critical compliance-related data[.]"[136] In *United States ex rel. Bilotta v. Novartis Pharmaceuticals Corp.*, the defendant did not even monitor events and would give only a "slap on the wrist" for instances of serious misconduct.[137] And in *United States ex rel. Gohil v. Sanofi U.S. Services Inc.*, there was evidence that "managers and sales personnel ignored [the relevant] compliance guidelines."[138]

To show Gilead's knowledge, Travis first points to federal regulatory guidance advising companies that their speaker programs would violate the AKS if they were intended to induce

---

[133] 42 U.S.C. § 1320a-7b(b)(2)(A).

[134] *United States v. Goldman*, 607 F. App'x 171, 174 (3d Cir. 2015).

[135] *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1274 (D.C. Cir. 2010).

[136] 2019 WL 1245656, at *12.

[137] 50 F. Supp. 3d at 504, 519.

[138] 500 F. Supp. 3d 345, 365-66 (E.D. Pa. 2020).

business.[139] This tautological argument misses the point. Of course Gilead was on notice that speaker programs can become illegal kickbacks. But Travis's standards are not part of laws or regulations, and Travis points to none that would put Gilead on notice that his critiques of the speaker program rendered it illegal.[140] Travis next points to evidence that he argues establishes that individuals at Gilead new the speaker program did not comply with the AKS. But this evidence is nothing more than the "business plans" discussed above and the results of third-party monitoring reports of the speaker programs that do not identify any statement of a Gilead employee showing knowledge that the speaker programs were shams (which as discussed above, the evidence cannot establish). Finally, Travis maintains that Gilead's Business Conduct Department was "singularly weak."[141] But the record reflects that Gilead's Business Conduct Department was headed by an attorney with experience in the pharmaceutical industry and staffed by 10 to 30 full-time employees, compared to the lone paralegal in *Arnstein II*.[142] As discussed above, employees attended training sessions on compliance policies and Gilead kept records on the quality of the presentations, the numbers of attendees, the use of sign-in sheets, the suitability of the venue, and adherence to spending limits.[143]

### c.  Causation

Gilead argues in the alternative that Travis's speaker program claims fail because he has not shown that any of the alleged kickbacks caused false claims.[144] "A kickback does not morph

---

[139] *See, e.g.*, OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731-01, 23737 (May 3, 2003).

[140] Rather, the evidence reflects that Gilead comported with PhRMA guidance, which provides recommendations for ensuring compliance with law and regulation. Def.'s Mot. Summ. J., Ex. 65, at 4 [Doc. No. 240-67].

[141] *Arnstein*, 2019 WL 1245656, at *12.

[142] *Id.*; Am. Expert Report of Saul B. Helman, MD, Def.'s Mot. Summ. J., Ex. 55 ¶¶ 82, 85 [Doc. No. 240-57].

[143] *E.g.*, Def.'s Mot. Summ. J., Ex. 26 [Doc. No. 240-28].

[144] 42 U.S.C. § 1320a-7b(g).

into a false claim unless a particular patient is exposed to an illegal recommendation or referral and a provider submits a claim for reimbursement pertaining to that patient."[145] The Third Circuit requires that a relator show that a patient was "exposed to" an illegal recommendation for a particular drug.[146] To do so, the physician's prescription "must not be susceptible to [] an obvious alternative explanation not involving illegal conduct."[147]

Here, Travis cannot overcome the obvious alternative explanation that speakers were exercising "sound medical judgment" by prescribing Gilead's newly available treatments to their HCV patients.[148] As discussed above, Sovaldi and Harvoni had enormous advantages over prior HCV treatments in terms of efficacy and convenience. Indeed, all eight medical providers deposed in this case testified that they chose to prescribe Sovaldi and Harvoni based on their sound medical judgment, not because of payment from the speaker program.[149]

Travis has not adduced sufficient evidence to create a genuine dispute of material fact that the speaker programs were intended to induce prescriptions, that Gilead had the requisite scienter to violate the AKS, or to establish causation under the FCA. Accordingly, the Court will grant Gilead summary judgment on the speaker program claims.

---

[145] *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 100 (3d Cir. 2018).

[146] *Id.*

[147] *Wilkerson*, 2024 WL 1242989, at *12. *See also Scalamogna v. Steel Valley Ambulance*, No. 14-524, 2018 WL 3122391, at *7 (W.D. Pa. June 26, 2018) (holding that a false claim violation "requires that a patient be exposed to an illegal referral; that a provider submits a claim for government reimbursement pertaining to that patient; and that a party to the transaction solicits, receives, or offers a kickback to the referrer in exchange for the referral").

[148] *Wilkerson*, 2024 WL 1242989, at *12 (internal quotation marks omitted).

[149] Ankoma-Sey Dep., Def.'s Mot. Summ. J., Ex. 9, at 191-96 [Doc. No. 240-12]; Crippin Dep., Def.'s Mot. Summ. J., Ex. 7, at 234, 237 [Doc. No. 240-10]; Dang Dep., Def.'s Mot. Summ. J., Ex. 56, at 170-71 [Doc. No. 240-58]; Frazier Dep., Def.'s Mot. Summ. J., Ex. 22, at 199 [Doc. No. 240-24]; Lebovics Dep., Def.'s Mot. Summ. J., Ex. 53, at 161-62 [Doc. No. 240-55]; Schneider Dep., Def.'s Mot. Summ. J., Ex. 57, at 148-49 [Doc. No. 240-59]; Tobias Dep., Def.'s Mot. Summ. J., Ex. 58, at 227-28 [Doc. No. 240-60]; Welti Dep., Def.'s Mot. Summ. J., Ex. 59, at 183-84 [Doc. No. 240-61].

4.  PAN Foundation Donations

Travis's second theory of liability is that Gilead's donations to the PAN Foundation were kickbacks to Sovaldi and Harvoni patients to induce them to purchase the drugs. This Court previously held, at the Motion to Dismiss stage, that Travis's claims could survive dismissal because Travis alleged that "specific funds were set aside for Sovaldi and Harvoni prescriptions by the PAN Foundation," that Gilead "analyz[ed] the amount of money" PAN would need for Sovaldi and Harvoni specifically, and "use[d] that information to determine how much to donate."[150] Gilead argues that Travis has not adduced evidence creating a dispute of material fact that: 1) the PAN donations were intended to induce prescriptions; or 2) Gilead had the scienter necessary to violate the AKS.

a.  *Intended to induce prescriptions*

First, Gilead argues that Travis has not carried his burden of showing that Gilead's donations to the PAN Foundation had the purpose of inducing PAN beneficiaries to use Sovaldi and Harvoni specifically, rather than increasing access to HCV therapies generally.

Liability for a claim based on charitable donations "attaches only" when "it is clear that the remunerations were designed specifically to encourage claims to Medicare."[151] "[T]he AKS is not violated where a company hopes or expects that 'referrals may ensue from remuneration that was designed wholly for other purposes.'"[152] Courts have accordingly found viable AKS-FCA claims arising from donations to patient access programs only when there is evidence that the manufacturer used information specific to its own drugs to determine when or how much to donate, or when there is evidence that the charity set aside funds for the manufacturer's products

---

[150] Mem. Op. at 23 [Doc. No. 67].

[151] *U.S. v. Teva Pharms. USA, Inc.*, 560 F. Supp. 3d 412, 420 (D. Mass. 2021).

[152] *Id.* (citation modified).

specifically.[153] A defendant cannot be held liable for "giving money to co-pay foundations" where there is "no evidence that . . . donations were contingent on the foundation's agreement to purchase or recommend [defendant's] drugs."[154]

Here, Travis cannot point to any evidence that PAN operated separate funds for Sovaldi and Harvoni, or that Gilead attempted to determine how much demand PAN would have for Sovaldi and Harvoni specifically and calibrated its donations to that demand. Instead, the evidence in the record is that: Travis's expert Genevieve Kanter admitted that "Gilead's donations to the PAN Foundation's hepatitis C fund were *not* specifically earmarked for Gilead drugs;"[155] PAN's HCV fund provided assistance for numerous non-Gilead medications;[156] and Gilead's Co-Pay Steering Committee considered PAN's requested donation amounts without evaluating the extent to which such donations may support Sovaldi or Harvoni.[157] Furthermore, Gilead argues that the evidence shows that it donated far more to PAN's HCV fund than the fund paid out in assistance for Sovaldi and Harvoni, undermining any argument that Gilead correlated its donations with demand.[158]

---

[153] *See United States ex rel. Vitale v. MiMedx Grp. Inc.*, 381 F. Supp. 3d 647, 659 (D.S.C. 2019) (finding viable AKS-FCA claim where defendant had allegedly identified patients who would be eligible for PAN funding and made contributions in an amount correlated to that information); *Teva*, 560 F. Supp. 3d at 420 (same, where defendant "structured its donations to ensure that they would be used exclusively to generate sales of [defendant's drug] by "coordinat[ing] the timing of its donations with the submission of batch files of applications"); *U.S. v. Regeneron Pharms., Inc.*, No. 20-11217, 2020 WL 7130004, at *12 (D. Mass. Dec. 4, 2020) (same, where charity "regularly sent defendant drug-specific data about the number and cost of Eylea prescriptions . . . and precise requests for just enough donation money to fund its projected expenditures on Eylea patients"); *U.S. ex rel. Strunck v. Mallinckrodt Ard LLC*, Nos. 12-175, 13-1776, 2020 WL 362717, at *6 (E.D. Pa. Jan. 22, 2020) (same, where defendant insisted on a single-drug fund "to ensure that only patients treating with Acthar would receive the benefits of its 'donations'").

[154] *Brown*, 226 F. Supp. 3d at 1057.

[155] Expert Report of Genevieve Kanter, PhD, Def.'s Mot. Summ. J., Ex. 72 ¶ 55 [Doc. No. 240-74] (emphasis added).

[156] Def.'s Mot. Summ. J., Ex. 68 [Doc. No. 240-70].

[157] *E.g.*, Def.'s Mot. Summ. J., Ex. 35 [Doc. No. 247-9]; Def.'s Mot. Summ. J., Ex. 36 [Doc 247-10].

[158] Jena Rpt. ¶ 110 [Doc. No. 247-2].

As evidence that Gilead intended for its PAN donations to induce prescriptions of Sovaldi and Harvoni, Travis points to Gilead's use of data gathered from Support Path in tandem with the data it received from the PAN foundation and argues that the record suggests that Gilead devised this two-prong scheme to manipulate donations and induce prescriptions of Sovaldi and Harvoni. "Support Path" directed patients who needed payment assistance to PAN to help pay for their prescriptions, and Gilead tracked the number of patients who sought support from PAN through Support Path. There is nothing inherently problematic about Gilead's keeping metrics on the actions its Support Path took to support patients. Moreover, Gilead only tracked *referrals* to PAN through Support Path—Travis does not allege that Gilead tracked how many individuals sought and obtained assistance from PAN.[159] Even if it did, Gilead would only have known the number of Sovaldi and Harvoni patients who received PAN assistance after first contacting Support Path, which would be a fraction of the total patients supported by PAN. Second, PAN's aggregate "demand model" data showed the total number of patients receiving assistance from PAN on a monthly basis and projected patient need. This sort of limited reporting of aggregate data has been approved by HHS.[160] Travis alleges that Gilead used this data to determine the amount of money it needed to donate to PAN to ensure all co-pays were covered.

Travis cobbles these two pieces of lawful conduct—Gilead's collecting data on Support Path efficacy and PAN's provision of aggregate data—to attempt to make out a dispute of material fact that Gilead was manipulating its donations. The evidence simply does not support this argument. The evidence Travis points to are two slides detailing PAN's aggregate data from

---

[159] Pls.' Resp. Undisputed Facts & Counterstatement Material Facts ¶¶ 398-400 [Doc. No. 270].

[160] OIG Special Advisory Bulletin on Patient Assistance Programs, 70 Fed. Reg. 70623-03, 70626 n.16 (Nov. 22, 2005).

the first half of 2015 and its projections for 2016.[161] But again, this data came from PAN, which *permissibly* supplied this data to Gilead and other donors.[162] The slides do not indicate that Gilead had Sovaldi- or Harvoni-specific prescription data from PAN, nor do the slides suggest that this data influenced the size or timing of Gilead's donations. To the contrary, Gilead donated the full amount that PAN requested, usually within a few days of the request.[163]

Next, Travis points to statistical analysis from his expert, Dr. Kanter, who posits an "association between Gilead donations and Gilead-specific patient assistance, combined with a lack of association between Gilead donations and non-Gilead patient assistance."[164] Even accepting Dr. Kanter's analysis at face value and drawing all inferences in Travis's favor, any correlation between the size of Gilead's donations and PAN's assistance to Sovaldi and Harvoni patients is, at most, the logical result of Gilead's market share for HCV medicines at the time. Indeed, as Gilead points out, the correlation between the size of Gilead's donations and PAN's total assistance for *all* HCV products is just as high, because PAN based its donation requests to Gilead on *overall* demand projections for HCV medicines.[165] As described above, Sovaldi and Harvoni completely revolutionized HCV treatment, allowing more patients to access, tolerate, and complete treatment. So much of PAN's assistance went to Sovaldi and Harvoni patients simply because Sovaldi and Harvoni had a significant market share.[166]

---

[161] Pls.' Mem. Law Opp'n Def.'s Mot. Summ. J., Ex. 415 [Doc. No. 271-250].

[162] Def.'s Mot. Summ. J., Ex. 69 [Doc. No. 240-71]; Pls.' Mem. Law Opp'n Def.'s Mot. Summ. J., Ex. 420 [Doc. No. 271-255].

[163] Def.'s Reply Mem. Law Supp. Mot. Summ. J., Ex. 655 [Doc. No. 288-1].

[164] Expert Report of Genevieve Kanter, PhD, Def.'s Mot. Summ. J., Ex. 72 ¶ 55 [Doc. No. 240-74].

[165] Expert Rebuttal Report of Dr. Anupam Jena, Def.'s Mot. Summ. J., Ex. 61 ¶ 79 [Doc. No. 247-17].

[166] Jena Rpt. ¶ 117 & Ex. 27 [Doc. No. 247-2]; Expert Rebuttal Report of Dr. Anupam Jena, Def.'s Mot. Summ. J., Ex. 61 ¶ 79 [Doc. No. 247-17]; Jena Dep., Def.'s Mot. Summ. J., Ex. 62, at 302 [Doc. No. 240-64]. This is true regardless of whether PAN's payout of Sovaldi and Harvoni claims is at or under its market share, as Gilead's expert suggests, or slightly above, as Travis's expert suggests.

Absent any evidence that Gilead used information specific to its own drugs to determine the amount or timing of its donations or a drug-specific fund, Travis's allegations that Gilead's PAN Donations were intended to induce prescriptions of Sovaldi and Harvoni cannot survive summary judgment.[167] Fundamentally, Travis "presents no evidence that these donations were contingent on the foundation's agreement to purchase or recommend" Sovaldi and Harvoni. [168] Travis has not created a genuine dispute of fact over whether Gilead's donations to PAN were intended to induce prescriptions to Sovaldi and Harvoni.

### b. Scienter

Gilead next argues that it is entitled to summary judgment because Travis has again failed to show that Gilead acted with the requisite scienter that it "knowingly" violated the FCA or "willfully" violated the AKS in connection with the speaker programs. Gilead bases its argument on its compliance with regulatory guidance provided by the Office of the Inspector General of the Department of Health and Human Services intended to provide information on how to provide assistance to patient assistance programs "in a manner that does not run afoul of the Federal anti-kickback statute[.]"[169] Compliance with these regulatory factors, Gilead argues, renders any violation of the AKS unwilful.

For Travis to prove that Gilead violated the AKS, he must show that Gilead acted "knowingly and willfully."[170] In particular, Travis must show Gilead "knew [that its] conduct was unlawful and intended to do something the law forbids."[171] While "no proof of specific

---

[167] *Compare supra* n. 155.

[168] *Brown*, 226 F. Supp. 3d at 1057.

[169] OIG Special Advisory Bulletin on Patient Assistance Programs, 70 Fed. Reg. 70,623-03, 70,624 (Nov. 22, 2005).

[170] 42 U.S.C. § 1320a-7b(b)(2).

[171] *Goldman*, 607 F. App'x at 174.

intent to defraud" is required, Travis must show at least that Gilead acted with "reckless disregard" or "deliberate ignorance." [172]

"[P]harmaceutical manufacturers can effectively contribute to the pharmaceutical safety net by making cash donations to independent, bona fide charitable assistance programs."[173] The Office of the Inspector General of the Department of Health and Human Services has promulgated guidance for how a pharmaceutical manufacturer can "properly structure[]" a donation program "to an independent, bona fide charity that provides cost-sharing subsidies for Part D drugs" that raises "few, if any, anti-kickback statute concerns:"[174]

> (i) Neither the pharmaceutical manufacturer nor any affiliate of the manufacturer (including, without limitation, any employee, agent, officer, shareholder, or contractor (including, without limitation, any wholesaler, distributor, or pharmacy benefits manager)) exerts any direct or indirect influence or control over the charity or the subsidy program;

> (ii) The charity awards assistance in a truly independent manner that severs any link between the pharmaceutical manufacturer's funding and the beneficiary (i.e., the assistance provided to the beneficiary cannot be attributed to the donating pharmaceutical manufacturer);

> (iii) The charity awards assistance without regard to the pharmaceutical manufacturer's interests and without regard to the beneficiary's choice of product, provider, practitioner, supplier, or Part D drug plan;

> (iv) The charity provides assistance based upon a reasonable, verifiable, and uniform measure of financial need that is applied in a consistent manner; and

> (v) The pharmaceutical manufacturer does not solicit or receive data from the charity that would facilitate the manufacturer in correlating the amount or frequency of its donations with the number of subsidized prescriptions for its products.[175]

---

[172] 31 U.S.C. § 3729(a)(1)(A)-(B).

[173] OIG Special Advisory Bulletin on Patient Assistance Programs, 70 Fed. Reg. 70,623-03, 70,626 (Nov. 22, 2005).

[174] *Id.*

[175] *Id.*

"Simply put, the independent charity [patient assistance program] must not function as a conduit for payments by the pharmaceutical manufacturer to patients and must not impermissibly influence beneficiaries' drug choices."[176]

The facts adduced in discovery support that Gilead acted in accordance with this guidance and therefore did not have the requisite scienter to establish an AKS violation. First, Gilead did not exert "direct or indirect influence or control" over the PAN Foundation. [177] Gilead entered into donation agreements with PAN making clear that PAN was an independent organization with exclusive control over its own eligibility criteria, and that it would not treat applications differently based on the treatment they were prescribed.[178]

Second and third, PAN "award[ed] assistance" independently, and "without regard [to Gilead's] interests."[179] PAN provided co-pay assistance for a wide range of HCV drugs—including Harvoni and Sovaldi's most significant competitors.[180] And as discussed above, the assistance PAN gave to Gilead products was relatively consistent with—no more than a few percentage points greater than—their market share.

Fourth, PAN used "reasonable, verifiable, and uniform measure[s] of financial need" to determine eligibility.[181] Patients were required to have income below 400 to 500% of the poverty line, and assistance was capped at $4,500 to $10,000 per year.[182] PAN only assisted with co-

---

[176] *Id.*

[177] *Id.*

[178] 2013 Donation Agreement, Def.'s Mot. Summ. J., Ex. 34, at GSI01098939 [Doc. No. 247-8].

[179] OIG Special Advisory Bulletin on Patient Assistance Programs, 70 Fed. Reg. 70,623-03, 70,626 (Nov. 22, 2005).

[180] Def.'s Mot. Summ. J., Ex. 68 [Doc. No. 240-70].

[181] OIG Special Advisory Bulletin on Patient Assistance Programs, 70 Fed. Reg. 70,623-03, 70,626 (Nov. 22, 2005).

[182] Def.'s Mot. Summ. J., Ex. 35, at ECF page 11 [Doc. No. 247-9].

pays, so applicants were required to have insurance.[183] Finally, Gilead did not "solicit or receive data" from Pan that would have allowed Gilead to "correlat[e]" its donations with demand for Sovaldi and Harvoni.[184] There is no evidence Gilead received such data, and the donation agreements in the record provide that "[a]ggregate data shall not permit [Gilead] to correlate the amount or frequency of its Donations with the amount or frequency of the use of its products or services."[185]

As evidence of Gilead's scienter, Travis points to the following: that Gilead hired Korab Zuka, a previous executive of PAN; that Gilead did not award assistance without regard to its own interests; and that Gilead used "demand models" that PAN sent to Gilead with its donation requests that projected the overall demand for HCV treatments on PAN's formularies. On the third point, Travis also points to data from Gilead's Support Path program, arguing that Gilead used data from callers to "address gaps on the referral volume of Government-insured patients to PAN."[186] Travis finally argues that Gilead "excluded the Business Conduct Department from decision-making with respect to [PAN] donations."[187]

None of this evidence is sufficient to create a genuine question of fact regarding whether Gilead had the requisite scienter for an AKS violation. As to Zuka, Travis does not allege he took any improper actions, only that his previous employment at PAN should be suspicious.[188] However, his past employment at PAN could not have given Gilead insight into PAN's future Sovaldi and Harvoni demand, which occurred later. Travis's next argument that Gilead did not

---

[183] *Id.* at ECF page 7.

[184] OIG Special Advisory Bulletin on Patient Assistance Programs, 70 Fed. Reg. 70,623-03, 70,626 (Nov. 22, 2005).

[185] 2013 Donation Agreement, Def.'s Mot. Summ. J., Ex. 34 [Doc. No. 247-8].

[186] Pls.' Mem. Law. Opp'n Mot. Summ. J. at 25 [Doc. No. 269].

[187] *Id.* at 26.

[188] "With all due respect, so what?" *Perales*, 243 F. Supp. 2d at 851.

award assistance without regard to its own interests is based on his expert's analysis demonstrating that the share of PAN HCV Fund payouts for Sovaldi and Harvoni consistently exceeded their market share between 2014 and 2019 by five to 14 percent. Travis does not explain how this evidence, on its own, illustrates that Gilead awarded assistance with regard to its own interests, nor does it provide a sufficient basis for a jury to assume that Gilead willfully violated the AKS. And third, the evidence shows that the only data Gilead received from PAN is that aggregate data that patient assistance programs are *permitted* to provide to pharmaceutical manufacturers. Travis points to no evidence suggesting otherwise.

At bottom, Travis points to no evidence that anyone at Gilead knew that its donations to the PAN Foundation violated the AKS—or, alternatively, was deliberately ignorant of, or acted with reckless disregard to, AKS violations. Travis's "naked assertions, devoid of any evidence of scienter," cannot survive summary judgment.[189]

## IV.    GILEAD'S MOTION FOR TERMINATING SANCTIONS

Finally, the Court addresses Gilead's motion for terminating sanctions. Gilead asked the Court to dismiss Travis's case with prejudice because Travis's claims are based wholly on false allegations.[190]

"The inherent powers of federal courts include the 'well-acknowledged' power 'to levy sanctions in response to abusive litigation practices.'"[191] "These powers are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to

---

[189] *United States v. The Boeing Co.*, 825 F.3d 1138, 1149 (10th Cir. 2016).

[190] *See* Def.'s Mot. Terminating Sanctions [Doc. No. 203].

[191] *In re Diet Drugs*, 381 F. Supp. 2d 421, 425 (E.D. P. 2005) (quoting *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 765 (1980)).

achieve the orderly and expeditious disposition of cases."[192] These sanctions include the "ultimate sanction" of dismissal of the case.[193] At the same time, however, the Third Circuit has a "longstanding tradition of favoring decisions on the merits" and "cases should be decided on the merits barring substantial circumstances in support of the contrary outcome."[194]

The Court need not determine whether the circumstances here reach the necessarily high bar required to grant the "ultimate sanction" of dismissal. The Court recognizes, however, that despite significant changes to the allegations across Travis's amended complaints, years of discovery, and significant private and public resources spent litigating this case, before the Court is now but a flimsy record for his case against Gilead.

Because the Court has decided the case here on the merits and granted Gilead's motion for summary judgment on all claims, the Court will dismiss Gilead's motion for terminating sanctions as moot.

## V.    REMAINING MOTIONS TO EXCLUDE EXPERT TESTIMONY

The parties have filed numerous motions to exclude various components of expert reports and testimony. Gilead conceded at oral argument on the summary judgment motion that "the Court can grant summary judgment even if it denie[s] all of the [*Daubert* motions Gilead] brought and grant[s] all of the [*Daubert* motions] that the relator brought."[195] The Court has treated any relevant expert evidence in that way—making all reasonable inferences in Travis's favor—and determined that deciding those motions is unnecessary to reach the merits of the summary judgment motion. Accordingly, those motions will be dismissed as moot.

---

[192] *Transystems Corp. v. Hughes Assocs., Inc.*, No. 14-1541, 2016 WL 3551474, at *4 (M.D. Pa. June 30, 2016) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)).

[193] *In re Diet Drugs*, 381 F. Supp. 2d at 425.

[194] *Hildebrand v. Allegheny Cnty.*, 923 F.3d 128, 132, 136 (3d Cir. 2019).

[195] Summ. J. Oral Arg. Tr. at 52 [Doc. No. 309].

## VI.  CONCLUSION

For the reasons stated above, the Court takes judicial notice of the requested Stipulation. Gilead's motion for summary judgment is granted on all claims and Gilead's motion for terminating sanctions is dismissed as moot.

An order will be entered.